**Opinion issued July 31, 2018**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————————

**NO. 01-17-00687-CV**

———————————————

**ROSALIND NG AND JOSHUA WOHLSTEIN, Appellants**

**V.**

**KATY-WASHINGTON, L.C. AND AVI RON, Appellees**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-27561**

---

**MEMORANDUM OPINION**

This appeal concerns the terms of a settlement agreement. The underlying dispute arises from the sale of real property.

Avi Ron and Rosalind Ng formed Katy-Washington, L.C. (the Company) to purchase investment property with funds provided by Joshua Wohlstein, who was

Ng's husband and Ron's business partner. Wohlstein provided the funds, and the Company purchased the property. Ron and Ng each owned 50% of the Company. Years later, the Company sold the property for a profit. Ng, Wohlstein, and Ron disputed how to allocate the proceeds from the sale. Litigation ensued, and the case proceeded to trial.

Shortly after trial began, the parties announced that they had settled the case, and they read the terms of their agreement into the record. But, when the parties attempted to memorialize their agreement in writing, they disagreed on whether the agreement released Wohlstein's claim against the Company for reimbursement for the Company's 2016 franchise taxes, which Wohlstein had paid out of pocket.

Ron filed a motion to enforce the parties' agreement, which, according to Ron, included Wohlstein's agreement to release his tax-reimbursement claim. The trial court granted the motion, construing the parties' agreement as releasing the claim. The trial court later entered final judgment, which again found that Wohlstein had released his claim and appointed Ron as the Company's liquidator.

In three issues, Ng and Wohlstein contend that (1) the trial court erred in granting Ron's motion to enforce the Rule 11 agreement without requiring Ron to plead and prove a breach-of-contract claim, (2) the trial court erred in construing the Rule 11 agreement as releasing Wohlstein's claim for reimbursement for

payment of the Company's 2016 franchise taxes, and (3) the trial court abused its discretion in appointing Ron to serve as the Company's liquidator. We affirm.

## Background

### *Ron and Ng form the Company*

Ron and Wohlstein are former business partners. For twenty-some-odd years, Ron and Wohlstein purchased and resold real estate through a series of single purpose entities. In January 1998, Wohlstein's wife, Rosalind Ng, acting with Ron, formed the Company to purchase investment property with funds provided by an entity owned by Wohlstein, Vileria, Ltd.

Ron and Ng were the Company's only two members, and each owned a 50% interest. Ron was the sole manager and took care of the Company's day-to-day operations. As manager, Ron had the right to "act as liquidator" during the Company's winding up. Ng oversaw the Company's financial matters and bank account.

### *The Company purchases property with funds provided by Vileria*

After the Company's formation, Wohlstein, through Vileria, provided the Company with two tranches of funds, totaling $484,000. The first tranche was for $180,000, which the Company used to purchase property in west Houston. The second tranche was for $304,000, which the Company used, along with the

proceeds from the sale of the west Houston property, to purchase property in northeast Houston.

### *The Company sells the property and escrows the disputed funds*

The Company held the northeast property for roughly sixteen years. Then, in March 2015, Ron, acting in his capacity as manager, entered into an agreement on the Company's behalf to sell the property to a third-party buyer. The terms of the sale included a roughly $7.6 million purchase price and a 4% broker's commission split equally between the two brokers. An employee of Ron's real estate firm, Justin Patchen, served as the Company's broker in the transaction.

But before the transaction closed, a dispute arose between Ron, Ng, and Wohlstein concerning whether Ng had consented to the terms of the sale and how the parties would distribute the net proceeds. Ng and Wohlstein alleged that Ng never agreed to the 4% broker's commission and that Wohlstein was owed a "fair return" on the $484,000 provided by Vileria to purchase the property in 1998. As a result of the dispute, the parties entered into an escrow agreement, which allowed the Company to close the sale and deposit the proceeds into escrow pending resolution of their dispute.

### *Litigation ensues*

The parties did not resolve their dispute, and litigation ensued. In May 2015, Ron and the Company sued Ng. As amended, the petition requested that the trial

court declare how to distribute the escrowed funds and order the winding up of the Company. Ng filed an answer and a counterclaim. In her counterclaim, Ng sought an accounting and asserted claims for money had and received, breach of contract, and breach of fiduciary duty, among others. Wohlstein intervened, seeking a fair return on the funds provided by Vileria.

The litigation's focus was on the proper distribution of the escrowed funds. Ron argued that Vileria should be repaid its $484,000 without interest, his employee Patchen should receive his full commission, and Ron and Ng should split the remainder. Ng and Wohlstein argued that there should be a "fair" distribution of the proceeds in light of all the circumstances, including Wohlstein's disproportionate contribution of funds through Vileria and Ron's alleged failure to reimburse Ng for various company expenses. Ng and Wohlstein further argued, in the alternative, that the funds provided by Vileria should be characterized as a loan entitling Vileria to statutory interest.

### *Wohlstein pays the Company's annual franchise taxes*

In April 2016, while suit was pending, Wohlstein emailed Patchen, who had been acting as Ron's agent, to coordinate payment of the Company's annual franchise taxes. In the email, Wohlstein stated that the Company needed to pay $33,000 by April 15. Wohlstein further stated he was "laying out the entire amount" on behalf of the Company and was "making a cash call for half the

5

amount," $16,500. He asked that Ron make a check payable to the Company for that amount and mail it to Ng. Wohlstein stated that he would forward Patchen and Ron the "tax extension papers" as soon as he received them from his accountant.

The next day, Patchen responded that he needed a "better understanding regarding the $33,000 for taxes." He asked Wohlstein to provide him with "back up for what exactly the $33,000 is being paid, and a copy of the check [he] sent." Patchen further asked Wohlstein to "clarify to which taxing authority" he was paying the $33,000. Patchen continued:

> As this is a LP, any taxes owed would flow thru the K1's which then become the responsibility of the partners . . . . Once I have more detailed information, we will be happy to pay our half of the amount owed.

In late April, Wohlstein paid $33,000 out of pocket for the Company's franchise taxes. Roughly five months later, the Texas comptroller refunded $12,522.39 to the Company. The refund was deposited into the Company's bank account. But Ron never reimbursed Wohlstein for his share of the $33,000 advance or paid him the $12,522.39 refund, and Wohlstein amended his Rule 194 disclosures to state that his damages should be based on both his contribution of $484,000 in 1998 to purchase the property and his contribution of $33,000 in 2016 to pay the Company's franchise taxes.

6

*The parties enter into a Rule 11 agreement to settle the case*

Ng and Wohlstein eventually lost their "fairness" claims on summary judgment, and the case proceeded to trial. During a break in jury selection, the parties reached a settlement. Under the agreement, Patchen would reduce his commission by one-half, Ron would bear sole responsibility for paying Patchen's reduced commission, Wohlstein would not receive any return on his $484,000 investment, and the parties would release their claims against each other and dissolve the Company with the winding-up expenses split evenly. The settlement was read into the record by the parties' attorneys:

> Ron's attorney: The parties to the settlement agreement are: Katy Washington L.C., Avi Ron, Joshua Wohlstein, Rosalind Ng, Vileria Ltd. and Justin Patchen. The payment terms are $484,000 returned to Vileria Ltd. by sending it to John McFarland's Trust Account.
>
> Ng and Wohlstein's attorney: The funds are going to be paid to Joshua Wohlstein and/or Rosalind Ng by payment into the trust account for Joyce and McFarland L.L.P. In full satisfaction of whatever moneys are owed to Vileria and with an indemnity, I will be flowing back from either Ms. Ng, or both Ms. Ng and Mr. Wohlstein for any potential third-party liability to Vileria that may flow from that payment.
>
> Ron's attorney: Yes. Also, let's see. Avi Ron on the one hand, and then Rosalind Ng and Joshua Wohlstein on the other, will be splitting 50/50 of the remaining assets in escrow—the remaining assets of the company, including the escrow, except that Avi Ron—50/50, I think I said that. 50/50 is the split, except that Avi Ron will have his recovery reduced by $80,000 which shall be paid to Justin Patchen. The parties will bear the cost to [wind] up Katy-Washington L.C., 50/50. That is Ng and Wohlstein on the one hand and Avi Ron on the other, and the split, again, on wind up is 50/50. Let's see. Justin Patchen's judgment

against Katy-Washington L.C., will be satisfied and released. And the parties to this settlement will enter mutual releases among and applicable to all the parties releasing all of the other parties—

Ron's attorney: —related to the claims in this suit.

Ron's attorney: Parties agree to dissolve Katy-Washington L.C., and file tax returns in a prompt manner.

Patchen's attorney: And there is one additional condition that the parties agree and stipulate that: There is no breach of fiduciary relationship or fraud by any party to this action.

Ron's attorney: I believe the way we phrased it was: There has been no finding of any breach of fiduciary duty or fraud in this case.

Patchen's attorney: That's fine.

Ng and Wohlstein's attorney: Correct. And all of these claims are disputed claims that have been solved.

Patchen's attorney: And each party is going to pay, I believe, is going to pay their own attorney's fees.

Ron's attorney: Costs and attorney's fees will be paid by the party.

*    *    *

Trial court:  Okay. So, we have a valid Rule 11 agreement dictated in open Court.

After the parties' read their Rule 11 agreement into the record, they agreed to release the jury.

***The parties dispute whether the settlement agreement released Wohlstein's claim for reimbursement for the Company's taxes***

To memorialize and effectuate the parties' Rule 11 agreement, Ron drafted a written agreement, entitled "Confidential Settlement and Release Agreement." The draft agreement included the following two sections, which addressed the distribution of the escrowed funds and the winding up of the Company:

3.  Distribution of Assets.

The Parties shall submit an agreed order so that the escrowed funds . . . shall as soon as is practical be distributed as follows:

- $484,000 will be distributed to the IOLTA account of Joyce + McFarland LLP for the benefit of Vileria;

- $80,000 will be distributed to Patchen;

- $80,000 will be distributed to the Wohlstein Parties;

- One half of the remaining Funds will be distributed to the Wohlstein Parties; and

- One half of the remaining Funds will be distributed in equal parts to Avi Ron (or his designee) and [Ron's wife] (or her designee).

The distributions set forth in this Section 3 and Section 4, below, are the only amounts owed by Katy-Washington to any Party.

4. Winding Up

Pursuant to sections 11.051(2) and 101.552(a)(1) of the Texas Business Organizations Code, the Member Parties agree to voluntarily terminate Katy-Washington's existence once the distributions required by Section 3 hereof are completed. In the event the parties are unable to agree to the conduct of the winding-up of Katy-Washington,

pursuant to section 11.054 of the Texas Business Organizations Code, the parties expressly consent to allow a District Court of Harris County, Texas to supervise the winding-up and to appoint a person to carry-out the winding up. The Parties agree to equally bear the reasonably and necessary costs of the wind-up to the extent that they exceed the cash available from the Company after the distributions set forth in Section 3 above.

Following the wind-up of Katy-Washington, L.C., any remaining net assets of Katy-Washington, including without limitation, all cash, receivables, property, tax credits, or assets of any form shall be distributed one half (50%) to the Wohlstein Parties and one half in equal parts (25% and 25%) to Avi Ron (or his designee) and Suzanne Ron (or her designee).

Ng and Wohlstein objected to the wording, noting that Wohlstein had "loaned the company funds to pay company expenses"—i.e., the $33,000 for the Company's 2016 franchise taxes. They contended that this loan was "not included in Ng's capital account" and needed to be "carved out" of the escrowed funds. Ron disagreed. In an email reply, he stated: "There was no carve out of these 'loans' from [Wohlstein] to [the Company]. We specifically discussed that and it almost blew the deal . . . . We specifically stated that this was going to be a release and recited it on the record."

The parties reached an impasse, prompting Ron and the Company to file a motion to enforce the Rule 11 agreement. The motion requested that the trial court (1) compel Ng and Wohlstein to execute a release of any claims related to the suit, including Wohlstein's claim for reimbursement for payment of the Company's franchise taxes as part of the Company's winding up, and (2) declare that the Rule

10

11 agreement released any claim asserted by Wohlstein that might be satisfied by the escrowed funds or through the Company's winding up.

Ng and Wohlstein filed a response to Ron's motion to enforce, arguing that the Company's obligation to repay Wohlstein for the $33,000 loan remained a liability to be addressed during the winding up process. According to Ng and Wohlstein, the parties had always contemplated a winding up process whereby they would settle any remaining liabilities of the Company before splitting the assets, and nothing in the parties' Rule 11 agreement impugned Wohlstein's right to be repaid on a loan for a legitimate company expense paid after the lawsuit was filed but before the settlement. Ng and Wohlstein noted that, "if the funds had come from an unrelated party—e.g., a financial institution—no one would argue that the company should not have to repay the loan." Ng and Wohlstein requested that the trial court deny the motion to enforce, order the disbursement of the escrowed funds not in dispute, and appoint a third-party receiver to preside over the Company's winding up.

The trial court granted Ron and the Company's motion to enforce: "Plaintiffs' Motion to Enforce Rule 11 Agreement is granted. Defendants Rosalind Ng and Joshua Wohlstein released all claims against Plaintiffs to be paid out of the escrowed funds or upon the winding-up of Katy-Washington. This includes any

11

claims that Wohlstein paid franchise taxes for or on behalf of Katy-Washington. Ng and Wohlstein shall execute a formal release of these claims."

Ng and Wohlstein filed a motion to reconsider. In the motion, Ng and Wohlstein argued, for the first time, that the motion to enforce was not the proper procedure for resolving the parties' dispute and that Ron and the Company were required instead to plead and prove a breach-of-contract claim.

The trial court denied Ng and Wohlstein's motion to reconsider and, after additional briefing from both sides, entered final judgment, which enforced the Rule 11 agreement. The trial court expressly found that Wohlstein's claim for the $33,000 loan had been released and appointed Ron to serve as the Company's liquidator:

> Katy-Washington shall be dissolved and wound-up in accordance with its Regulations, including the provision thereof designating its manager, Avi Ron, as liquidator. Ron and Ng shall each bear half the costs of the winding-up of Katy-Washington. These costs shall not include the $33,000 claim referenced Ng and Wohlstein's May 25, 2017 Response to Motion to Enforce Rule 11 Agreement because that claim was settled and released in the parties' Rule 11 Agreement. Katy-Washington shall file all required tax returns in a timely manner.

Ng and Wohlstein appeal.

### Propriety of Motion to Enforce

In their first issue, Ng and Wohlstein argue that the trial court erred in granting Ron's motion to enforce the Rule 11 agreement because the motion was not the proper procedural vehicle for resolving the parties' dispute over whether

12

the Rule 11 agreement released Wohlstein's claim for reimbursement for the Company's 2016 franchise taxes. Instead, Ng and Wohlstein argue, Ron was required to amend his petition to assert a breach-of-contract claim, and the trial court was required to permit the parties to conduct discovery before resolving the claim through summary judgment or a conventional trial.

Ng and Wohlstein did not raise this issue in their response to Ron's motion to enforce the Rule 11 agreement. Instead, they waited until the trial court granted Ron's motion to enforce and then raised the issue in their motion to reconsider. By failing to raise the issue in their response to Ron's motion to enforce, Ng and Wohlstein waived error. *See Guevara v. WCA Waste Corp.*, No. 01-15-01075-CV, 2017 WL 1483320, at *6 (Tex. App.—Houston [1st Dist.] Apr. 25, 2017, pet. dism'd) (mem. op.). We overrule Ng and Wohlstein's first issue.

## Construction of Rule 11 Agreement

In their second issue, Ng and Wohlstein contend that the trial court erred in construing the Rule 11 agreement as releasing Wohlstein's claim for reimbursement for payment of the Company's 2016 franchise taxes.

### A. Standard of review

The interpretation of an unambiguous contract is a question of law we review de novo using well-settled contract-construction principles.[1] *URI, Inc. v.*

---

[1] Neither party contends that the Rule 11 agreement is ambiguous.

*Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' expressed intent. *Id.* Objective manifestations of intent control, not what the parties allege they intended to say but did not. *Id.* at 763–64.

## B.    Analysis

Ng and Wohlstein contend that the trial court's construction of the Rule 11 agreement was erroneous because it (1) conflicts with the plain meaning of the parties' agreement and (2) results in a forfeiture of Wohlstein's claim against the Company, which is disfavored under Texas law. We consider each reason in turn.

First, Ng and Wohlstein contend that the trial court's construction of the Rule 11 agreement conflicts with the agreement's plain meaning. The parties' Rule 11 agreement, as read into the record, contemplated four steps: First, Vileria would be paid $484,000 from the escrowed funds. Second, Ron, on the one hand, and Ng and Wohlstein, on the other, would each receive 50% of the remaining escrowed funds, except that Ron's recovery would be reduced by $80,000 to pay Patchen's commission. Third, the parties would wind up the Company, splitting any outstanding debts or expenses. Finally, the parties would execute mutual releases "related to the claims in this suit." Thus, Ng and Wohlstein argue, the parties agreed to wind-up the Company—and, as part of the wind-up, to discharge the

14

Company's obligation to repay Wohlstein—before executing mutual releases. We disagree.

Ng and Wohlstein's proposed construction defeats the purpose of the parties' agreement, which was to settle the parties' claims. During the litigation, Wohlstein sought a disproportionate share of the proceeds because he had provided the funds to purchase the property and the funds to pay the Company's 2016 franchise taxes. Ng sought a disproportionate share of the proceeds because she had allegedly paid expenses like the Company's taxes without reimbursement from Ron. And they both sought interest allegedly due under the "loan contract" with Vileria. Under Ng and Wohlstein's proposed construction of the Rule 11 agreement, after the parties paid Vileria and divided the remaining escrowed funds, Ng and Wohlstein could simply re-assert their claims during the winding up of the Company, characterizing their claims as debts owed to them by the Company per their payment of Company expenses. If the Rule 11 agreement permitted the parties to recover on their claims against the Company during the winding-up process, then the agreement would not have actually settled the parties' claims against each other. Under these circumstances, and looking at the entirety of the Rule 11 agreement, the trial court did not err in concluding that the release of claims by Ng and Wohlstein released all their claims to reimbursements and that the winding-up process was for expenses paid to third parties.

15

Next, Ng and Wohlstein contend that the trial court's construction of the Rule 11 agreement was erroneous because it results in a forfeiture of Wohlstein's claim against the Company. Again, we disagree.

"Forfeitures are not favored in Texas, and contracts are construed to avoid them." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239 (Tex. 2016) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009)). But the Rule 11 agreement did not result in a forfeiture. "Forfeiture" is variously defined as "the divestiture of property without compensation," "the loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty," and "a destruction or deprivation of some estate or right because of the failure to perform some contractual obligation or condition." *Forfeiture*, BLACK'S LAW DICTIONARY (10th ed. 2014). The Rule 11 agreement did not divest Wohlstein of his claim without compensation. Under the Rule 11 agreement, Wohlstein released his claim against the Company in exchange for a payment to Vileria, half of the Company's remaining assets, and the release of Ron's claims against him, including his claim for attorney's fees. Thus, the Rule 11 agreement functioned like any other settlement agreement: Wohlstein gave something up (his franchise tax claim and other claims) and received something in return (payment to Vileria, half the remaining escrowed fund, and a release of his liability for attorneys' fees).

We overrule Ng and Wohlstein's second issue.

16

## Appointment of Receiver

In the third issue raised in their brief, Ng and Wohlstein contend that the trial court abused its discretion in appointing Ron, and not an independent, third-party receiver, to preside over the Company's winding up. However, at oral argument, Ng and Wohlstein conceded that the trial court did not abuse its discretion because the company agreement gave Ron, as manager, the right to "act as liquidator" during the Company's winding up. Accordingly, we overrule Ng and Wohlstein's third issue.

## Conclusion

We affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Higley, Brown, and Caughey.